**IN THE UNITED STATES DISTRICT COURT**
**DISTRICT OF UTAH, NORTHERN DIVISION**

| | |
|---|---|
| STACY S., individually and as guardian of M.K., a minor,<br><br>Plaintiff,<br>v.<br><br>THE BOEING COMPANY EMPLOYEE HEALTH BENEFIT PLAN (PLAN 626), and VALUEOPTIONS,<br><br>Defendants. | **MEMORANDUM DECISION AND ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**<br><br>Case No.: 1:15-CV-72<br>District Judge Robert J. Shelby |

This case involves medical treatment that M.K., a minor, received from March 27 to July 1, 2013. Plaintiff, M.K.'s mother, brought this action for recovery of medical benefits that Defendants Boeing Company Employee Health Benefit Plan and ValueOptions (collectively, ValueOptions) denied. Plaintiff and ValueOptions each filed a Motion for Summary Judgment. For the reasons stated below, Plaintiff's Motion for Summary Judgment is DENIED[1] and ValueOptions' Motion for Summary Judgment is GRANTED.[2]

## BACKGROUND

M.K. is a beneficiary of the Boeing Company Employee Health Benefit Plan (the Plan). Drawing on the criteria explained in the Plan, ValueOptions denied Plaintiff's request for coverage for M.K.'s stay at Aspen, a residential treatment center (RTC) in Utah.

**The Plan Language**

The Plan provides benefits for Boeing employees, spouses, and dependents. The summary plan description (SPD) states that the Boeing Company Board of Directors designated

---

[1] Dkt. 30.

[2] Dkt. 29.

a committee to serve as Plan Administrator, which has the "absolute discretion" to "[d]elegate its administrative duties and responsibilities to persons or entities of its choice such as the Boeing Service Center, the service representatives, and employees of the Company."[3] The SPD also states that "[a]ll decisions that the Plan Administrator (or any duly authorized designees) makes with respect to any matter arising under the Plan and any other Plan documents are final and binding."[4] The SPD defines "service representative" as "an agent that the Company has contracted with to make benefit determinations and administer benefit payments under the plans described in this booklet."[5] ValueOptions is listed as the service representative for mental health benefits.[6] Under the heading "Who Administers the Benefits," the SPD states, "the Company has contracted various service representatives to handle the day-to-day administration of the plan. Service representatives answer benefit questions, make benefit decisions, pay claims, process claim appeals, and account for premiums, service fees and claim costs."[7]

The SPD also states a beneficiary may file a civil action in the district court within 180 days after "[d]ecision on appeal of your claim for benefits or eligibility."[8]

**Denial of Coverage**

This case stems from a denial of coverage for M.K.'s stay at Aspen, an RTC. Prior to her stay at Aspen, M.K. had been hospitalized at Seattle Children's Hospital after Plaintiff discovered M.K. was cutting herself. M.K.'s physician at Seattle Children's Hospital modified M.K.'s medication, and M.K. was discharged on March 9, 2013, with her physician's

---

[3] R. 44.

[4] *Id.*

[5] R. 1215.

[6] R. 1217.

[7] R. 1147.

[8] R. 1192.

recommendation that she participate in outpatient therapy.[9] The physician noted that M.K. "reported fewer thoughts to harm herself, and these stopped before discharge."[10]

M.K. was admitted to Aspen on March 27, 2013. An Aspen representative contacted ValueOptions to request authorization for M.K.'s inpatient mental health services. ValueOptions' medical director reviewed Aspen's request and concluded M.K. did not meet the criteria for acute in-patient hospitalization because she had shown improvement concerning her psychotic symptoms.[11] Instead, the medical director informed Plaintiff that an appropriate level of care would be partial hospitalization with intensive/structured setting.

ValueOptions notified Plaintiff of her right to appeal this decision in a letter sent March 29, 2013.[12] The letter stated that the proposed admission "was for evaluation and treatment of behaviors and symptoms of psychosis such as disorganized thoughts, hearing voices, or aggressive behaviors, indicating a risk of harm to self or others."[13] Based on the information provided as of March 27, 2013, ValueOptions stated its review did not "indicate the presence of behavior or thinking which would meet criteria for Acute Inpatient Hospitalization with 24 hour Medical Supervision."[14] Rather, ValueOptions stated that "[a]n appropriate level of care to the current needs of the patient is Partial Hospitalization with Intensive/Structured setting."[15]

---

[9] R. 882.

[10] R. 883.

[11] R. 975.

[12] R. 1021.

[13] *Id.*

[14] *Id.*

[15] *Id.*

Aspen notified ValueOptions that if M.K. stepped down to a lower level of care such as RTC services, Aspen would contact ValueOptions for precertification.[16]  Although Aspen provided M.K. with RTC services, it did not contact ValueOptions for precertification.

On May 13, ValueOptions received a claim from Aspen for RTC services provided from March 27 to April 30, 2013.  ValueOptions denied the claim on the basis that the services had not been authorized.[17]  After receiving more information from Plaintiff, ValueOptions' medical director reviewed the claim again in October 2013 and determined the services could not be certified because the criteria for RTC services had not been met.[18]  The medical director noted that many of the symptoms reported occurred before M.K.'s hospitalization and that M.K.'s outpatient therapist had expressed a concern that Plaintiff was seeking long-term placement for M.K. because she did not want her to return home.

ValueOptions' letter to Plaintiff notifying her of this decision recited the same clinical rationale as the March 27 letter, except it replaced "Acute Inpatient Hospitalization with 24 hour Medical Supervision" with "Residential Treatment Setting."[19]

Plaintiff requested an appeal of the denial in April 2014.  Plaintiff included a letter from M.K.'s outpatient therapist, who stated that long-term residential treatment "seems to be consistent with [his] impressions gathered over time, of [M.K.]'s growing needs."[20]  A psychiatrist who was not involved in prior decisions reviewed M.K.'s records and advised that RTC services should not be certified because M.K. did not exhibit any behavior or thinking that

---

[16] R. 973.

[17] R. 979.

[18] R. 981.

[19] R. 91.

[20] R. 880.

would warrant RTC services and that she could have been treated safely in a home setting through adolescent partial hospitalization or intensive outpatient treatment.[21]

ValueOptions notified Plaintiff of this decision on May 1, 2014.[22] The denial stated that ValueOptions' review "included any additional information received in support of your appeal." The denial was based on the psychiatrist's determination that M.K. "could have safely been treated in Adolescent Partial Hospitalization or Intensive Outpatient Treatment and remained in the home setting" and that she did not "show any behavior or thinking which would need the requested level of [residential treatment] care." The denial notified Plaintiff that the review was "the final level of appeal available to you through ValueOptions and your plan," but it did not notify Plaintiff of her 180-day time limit to file an action with the district court.

Plaintiff requested an external appeal, which Allmed was randomly selected to conduct. Allmed reviewed Plaintiff's appeal letters, M.K.'s medical records from Aspen, ValueOptions' denial letter, the Plan language, and ValueOptions' clinical criteria for child/adolescent RTC services. Allmed notified Plaintiff on October 16, 2014 that the RTC services were "not clinically appropriate, known to be effective for or consistent with the patient's condition, or in accordance with the generally accepted standards for residential care based on current literature."[23] Allmed stated M.K. "was not actively suicidal during her stay at [Aspen]" and that the self-injurious behavior she did exhibit "was superficial at best and did not require 24-hour intense supervision to control."[24] The letter also stated M.K. "did not manifest overt repetitive outbursts of aggression that required containment in a facility," and that her treatment "could

---

[21] R. 986.

[22] R. 1030.

[23] R. 1036.

[24] R. 1037.

have taken place safely and effectively at a lower level of care." The letter addressed M.K.'s weight as a health concern, but noted she did not have repetitive hospitalizations, did not fail at attempts at lower levels of care, and "did not demonstrate a home or community environment that would be considered not conducive to conducting treatment."

Following the denials, Plaintiff filed her Complaint on June 5, 2015, seeking $79,350 for denied medical benefits.[25]

## LEGAL STANDARD

Where, as here, the parties in an ERISA case both move for summary judgment, "the factual determination of eligibility for benefits is decided solely on the administrative record, and the non-moving party is not entitled to the usual inferences in its favor."[26] Additionally, the court considers "only the arguments and evidence before the administrator at the time it made [the] decision."[27]

## ANALYSIS

ValueOptions argues Plaintiff's civil action was untimely filed and should be dismissed. In the alternative, ValueOptions contends its decision to deny M.K. benefits was reasonable. Plaintiff argues the untimeliness of her action should be excused. She maintains the court should review the denial of benefits de novo, and hold that ValueOptions should have covered the RTC services.

---

[25] Dkt. 2.

[26] *LaAsmar v. Phelps Dodge Corp. Life, Accidental Death & Dismemberment & Dependent Life Ins. Plan*, 605 F.3d 789, 796 (10th Cir. 2010).

[27] *Sandoval v. Aetna Life & Cas. Ins. Co.*, 967 F.2d 377, 380 (10th Cir. 1992).

## I. Timeliness

ValueOptions first argues Plaintiff's claim must be dismissed as untimely because she did not file suit within 180 days of ValueOptions' final denial, as required by the Plan.

ERISA does not contain a limitations provision for district court actions, but parties may contractually agree on a time limit.[28] The Plan in this case requires filing a civil action within 180 days after notification of a final denial of benefits. Plaintiff does not dispute that she missed the 180-day deadline, but she argues the time limit is unenforceable because ValueOptions' failure to include the time limit in adverse benefit determination letters violated ERISA's claims procedure regulations.[29] The parties disagree about whether such a notification was required.

### A. ERISA's requirements

Two sections of ERISA address the information a plan administrator is required to include in its adverse benefit determinations. The court includes below the entirety of both, observing that the first includes in Subsection (iv) reference to "the time limits applicable" to review procedures. This provision is noticeably absent in Subsection 4 of the second applicable ERISA section. The first relevant section, 29 C.F.R. § 2560.503-1(g), is titled "Manner and content of notification of benefit determination." This section mandates that "any adverse benefit determination" include:

(i)     The specific reason or reasons for the adverse determination;
(ii)    Reference to the specific plan provisions on which the determination is based;

---

[28] *Salisbury v. Hartford Life & Acc. Co.*, 583 F.3d 1245, 1247 (10th Cir. 2009).

[29] Plaintiff also argues ValueOptions cannot enforce the contractual statute of limitations because (1) it failed to raise the time limit as an affirmative defense in its Answer, and (2) the sole reference to the 180-day deadline in the SPD was unclear, in violation of ERISA's requirement that the SPD "reasonably apprise such participants and beneficiaries of their rights and obligations under the plan." 29 U.S.C. § 1022. Because the court concludes ValueOptions was required to notify Plaintiff of the deadline in its denial letters, it need not reach these issues.

(iii)    A description of any additional material or information necessary for the claimant to perfect the claim and an explanation of why such material or information is necessary;

(iv)    A description of the plan's review procedures and the time limits applicable to such procedures, including a statement of the claimant's right to bring a civil action under section 502(a) of the Act following an adverse benefit determination on review.

The second relevant portion of ERISA, Section 2560.503-1(j), addresses "Manner and content of notification of benefit determination on review." This section requires an adverse benefit determination on review to include:

1)    The specific reason or reasons for the adverse determination;

2)    Reference to the specific plan provisions on which the benefit determination is based;

3)    A statement that the claimant is entitled to receive, upon request and free of charge, reasonable access to, and copies of, all documents, records, and other information relevant to the claimant's claim for benefits. . . .

4)    A statement describing any voluntary appeal procedures offered by the plan and the claimant's right to obtain the information about such procedures . . . and a statement of the claimant's right to bring an action under section 502(a) of the Act.

The court must take into account both sections when determining whether an adverse benefit determination on review must include the applicable time limits for the claimant's right to bring an action under Section 502(a), which is the claimant's avenue to file a civil action in district court.

## B.  Split in authority

The majority of courts that have interpreted Section (g)(1)(iv) conclude it requires a plan administrator to include, in adverse benefit determinations, the time limits for a civil action.[30] These courts find the plain language of Section (g)(1)(iv) compels that result because the position of the word "including" means the claimant's right to bring a civil action is part of the

---

[30] *See, e.g.*, *Santana-Diaz v. Metro. Life Ins. Co.*, 816 F.3d 172, 180 (1st Cir. 2016); *Mirza v. Ins. Adm'r of Am., Inc.*, 800 F.3d 129, 136 (3d Cir. 2015); *Moyer v. Metro. Life Ins. Co.*, 762 F.3d 503, 505 (6th Cir. 2014).

plan's review procedures. A contrary interpretation, in which notification of time limits for "review procedures" and notification of the right to bring a civil action are two distinct requirements, would read out the word "including" and replace it with "and."[31] The First, Third, and Sixth Circuits have held that such an interpretation does violence to plain text.[32] Thus, these courts conclude adverse benefit determinations must disclose the time limit for a claimant to file a civil action. However, none of these courts addressed how Section (g) interacts with Section (j)(4), which deals directly with adverse benefit determinations on review but omits Section (g)(1)(iv)'s language concerning time limits.[33]

The Tenth Circuit has not directly addressed this question. The Court addressed a related issue in *Hancock v. Metropolitan Life Insurance*, in which a claimant argued the plan administrator violated Sections (g)(1)(ii) and (g)(1)(iii) by providing her with a denial of an appeal that did not cite the provision upon which the denial was based and did not explain how she could perfect her claim.[34] The Tenth Circuit rejected that argument, stating that Section (g) "applies only to denials of benefits, not denials of appeals."[35] Although the Court referred to Section (g) as a whole, it applied only Section (g)(1)(ii) and (g)(1)(iii). In other words, the Court did not address Section (g)(1)(iv), and its holding does not contradict the conclusion in other Circuits that Section (g)(1)(iv)'s time limits notice requirement applies to final denials.

Given the nature of a final denial, there was no reason for the Tenth Circuit to apply either Section (g)(1)(ii) or Section (g)(1)(iii) in the context of denial of an appeal. To begin with,

---

[31] *See Santana-Diaz*, 816 F.3d at 180.

[32] *See id.* at 180; *Mirza*, 800 F.3d at 136; *Moyer*, 762 F.3d at 505.

[33] *See Santana-Diaz*, 816 F.3d at 181 n.8 (noting the possibility that Section (g)(1)(iv) applies only to initial, rather than final, benefit determinations, but concluding it was unnecessary to reach the question).

[34] 590 F.3d 1141, 1152 (10th Cir. 2009).

[35] *Id.* at 1153.

Section (g)(1)(ii)'s requirement of a "[r]eference to the specific plan provisions on which the determination is based" is repeated nearly verbatim in Section (j)(2), making application of Section (g)(1)(ii) unnecessary for final denials. Additionally, Section (g)(1)(iii)'s requirement of a "description of any additional material or information necessary for the claimant to perfect the claim" is nonsensical in the context of a final benefit determination, because the claimant has already exhausted her opportunities to provide such additional information. Thus, *Hancock*'s determination that Sections (g)(1)(ii) and (g)(1)(iii) do not apply to final benefit determinations has no bearing on Section (g)(1)(iv)'s potential relevance.

The Tenth Circuit also addressed a similar issue in an unpublished decision, *Young v. United Parcel Services*.[36] In that case, the Court interpreted language in an SPD stating an adverse benefit determination would contain "a description of the Plan's appeal procedures and the time limits applicable to such procedures, including a statement of your right to bring a civil action following a denial of your appeal."[37] The claimant argued that language required the plan administrator to notify her of the time limit for filing a civil action. The Court rejected that argument, stating that the "internal appeals process" was separate from "the filing of a legal action after that process has been fully exhausted," and that the SPD required time limits only for the former.[38]

Like *Hancock*, *Young* did not address the application of Section (g)(1)(iv). Additionally, two decisions in District of Utah cases have recently noted that Section (g)'s language is broader

---

[36] 416 F. App'x 734 (10th Cir. 2011).

[37] *Id.* at 739.

[38] *Id.* at 740.

than the SPD in *Young*.[39]  Both decisions observe that Section (g) requires notification of time limits for "the plan's review procedures," which includes both internal appeals and judicial review.[40]  Thus, *Young*'s holding is unhelpful for answering the question before the court today.

Because neither *Hancock* nor *Young* addressed Section (g)(1)(iv), district courts in the Tenth Circuit have been left with little guidance, giving rise to a split within this district.

The first District of Utah case to address this question was *Michael C.D. v. United Healthcare*.[41]  The court in *Michael C.D.* stated that *Young*'s holding concerning SPD language was persuasive for interpreting Section (g)(1)(iv).[42]  Applying *Young*, the court concluded Section (g) applies only to initial benefit determinations, and that Section (j) addresses final benefit determinations.  Because the time to file a civil action is not triggered until the final benefit determination, the court stated it would be "counterintuitive" to require plan administrators to give claimants notice of that timeline in an initial determination but not a final determination.[43]  Thus, the court concluded Section (g)(1)(iv) "only requires initial denial letters to include time limits applicable to a plan administrator's internal review procedures," and Section (j) "does not require the plan administrator to include any time limits for review procedures in the final denial letters."[44]

---

[39] *William G. v. United Healthcare*, No. 1:16-CV-00144-DN, 2017 WL 2414607, at *7 (D. Utah June 2, 2017); *John H. v. United Healthcare*, No. 1:16-cv-110-TC, 2017 U.S. Dist. LEXIS 73593 (D. Utah April 26, 2017).

[40] *Id.*

[41] No. 2:15-CV-306-DAK, 2016 U.S. Dist. LEXIS 64867 (D. Utah May 17, 2016).

[42] *Id.* at *13.

[43] *Id.* at *14.

[44] *Id.*

The same issue was presented a year later in *John H. v. United Healthcare*.[45] The court there stated "[t]he word 'including' necessarily modifies its previous clause, 'a description of the plan's review procedures,'" leading to the conclusion that a civil action is one of the "review procedures" for which a plan administrator must disclose the time limit.[46] The court explained this interpretation "aligns with ERISA's remedial nature" because "[c]laimants are more likely to read a relatively short denial letter, as opposed to long, complex plan documents."[47] In light of the text and policy considerations, the court found *Young* unpersuasive.[48] Section (j)(4)'s lack of an explicit requirement for notification of time limits did not alter the court's conclusion. Rather, the court noted that Section (g) applies to "any adverse benefit determination," which means "final denial letters must meet the requirements of both Subsection (g)(1)(iv) and the requirements of Subsection (j)(4)."[49]

This question arose again in *William G. v. United Healthcare*.[50] In that case, the court concluded that the only proper reading of Section (g)(1)(iv)'s use of the word "including" is that the section requires notification of time limits for civil actions in all denial letters.[51] The court pointed to the differences between Section (g) and Section (j), noting that Section (g) refers to "review procedures" as opposed to Section (j)'s "appeal procedures."[52] This, the court stated, was further evidence that the two sections do not conflict: "If the Department of Labor intended

---

[45] No. 1:16-cv-110-TC, 2017 U.S. Dist. LEXIS 73593 (D. Utah April 26, 2017).

[46] *Id.* at * 6.

[47] *Id.* at *7 (internal quotation marks omitted).

[48] *Id.* *13.

[49] *Id.* *14.

[50] No. 1:16-CV-00144-DN, 2017 WL 2414607 (D. Utah June 2, 2017).

[51] *Id.* at *5.

[52] *Id.*

that Subsection (g)(1)(iv) require denial letters to disclose only time limits related to internal appeal procedures, it would have used the more narrow phase —'appeal procedures'—found in Subsection (j)(4)(i) rather than the broader phrase—'review procedures'—when drafting Subsection (g)(1)(iv)."[53] And the court rejected the reasoning of *Michael C.D.*, stating that such a reading would render the word "any" in Subsection (g) superfluous.[54] The court concluded final benefit determinations must satisfy both Subsection (g) and Subsection (j)'s requirements.

This court is now presented with the same issue. For largely the same reasons articulated in the decision, the court agrees with the holdings in *John H.* and *William G.*, and concludes final benefit determinations must notify the claimant of the time limit to file an action in district court. This is explained more fully in the next Section.

### C. Application of canons of statutory construction

When analyzing a regulation, the court applies ordinary principles of statutory construction.[55] "Statutory construction must begin with the language employed by Congress and the assumption that the ordinary meaning of that language accurately expresses the legislative purpose."[56] Courts also must interpret statutes so that "if it can be prevented, no clause, sentence, or word shall be superfluous, void, or insignificant."[57] Another canon of statutory construction provides that "a negative inference may be drawn from the exclusion of language from one statutory provision that is included in other provisions of the same statute."[58]

---

[53] *Id.*

[54] *Id.* at *6.

[55] *Time Warner Entm't Co., L.P. v. Everest Midwest Licensee, L.L.C.*, 381 F.3d 1039, 1050 (10th Cir. 2004).

[56] *Park 'N Fly, Inc. v. Dollar Park & Fly, Inc.*, 469 U.S. 189, 194 (1985).

[57] *TRW Inc. v. Andrews*, 534 U.S. 19, 31 (2001).

[58] *Hamdan v. Rumsfeld*, 548 U.S. 557, 578 (2006).

The court recognizes that no reconciliation of Sections (g) and (j) would perfectly effect all the above-mentioned canons of statutory construction. Applying the plain language of Section (g) leads to the conclusion that "*any* adverse benefit determination" includes final determinations. But that reading renders several portions superfluous. If Sections (g)(1)(i) and (ii) already require a final determination to contain "[t]he specific reason or reasons for the adverse determination" and a "[r]eference to the specific plan provisions on which the determination is based," then there would be no need for Section (j) to repeat those requirements. Additionally, Section (g)(1)(iv)'s requirement that the plan administrator notify a claimant of the right to bring a civil action is repeated in Section (j)(iv) but without Section (g)'s language about time limits, which seems to implicate the negative-inference canon. Thus, no reading of the statute perfectly harmonizes the two sections.

Given this tension, the best solution is to rely on the plain language and conclude that any superfluousness that occurs is the result of Congress' intent to craft a statute that leaves no doubt as to the importance of explaining adverse benefit determinations to claimants.

Under this reading, Section (g)'s language concerning "any adverse benefit determination" includes final denials. The court finds no support in the plain language for the conclusion that Section (g) applies only to initial benefit determinations. Rather, the word "any" encompasses "final."

Additionally, the court agrees with the conclusion in *William G.* that giving meaning to the word "including" in Section (g)(1)(iv) must mean that a civil action is one of the "review procedures" for which a time limit must be provided. "[T]he word 'including' cannot be easily removed or changed since it modifies the word 'description,' which is followed by a prepositional phrase explaining what must be described—the plan's review procedures and

14

applicable time limits for those procedures."[59]  The resulting conclusion is that any benefit

determination requires notification of a time limit for filing a civil action.

This interpretation admittedly results in some duplication of requirements between

Sections (g) and (j), namely the reasons for the adverse determination, the reference to the

provision on which the determination is based, and the notification of the right to file a civil

action.  But this duplication reflects ERISA's policy considerations.  ERISA "is remedial

legislation that should be construed liberally in favor of those persons it was meant to benefit,

namely participants . . . and beneficiaries."[60]  Congress' stated intent in enacting ERISA was

> to protect interstate commerce and the interests of participants in employee benefit
> plans and their beneficiaries, by requiring the disclosure and reporting to
> participants and beneficiaries of financial and other information with respect
> thereto, by establishing standards of conduct, responsibility, and obligation for
> fiduciaries of employee benefit plans, and by providing for appropriate remedies,
> sanctions, and ready access to the Federal courts.[61]

The duplication of Section (g)'s provisions serves to highlight several of those stated

purposes, including the importance of disclosure of information to participants and ready access

to federal courts.

Additionally, as the First Circuit Court of Appeals noted, "[c]laimants are obviously more

likely to read information stated in the final denial letter, as opposed to included (or possibly

buried) somewhere in the plan documents, particularly since, as was the case here, plan

documents could have been given to a claimant years before his claim for benefits is denied."[62]

Reading Sections (g) and (j) to require notification of the time limit for a district court action in

---

[59] *William G.*, 2017 WL 2414607, at *5 (internal quotation marks omitted).

[60] *Jenkins v. Green Bay Packaging, Inc.*, 39 F.3d 1192 (10th Cir. 1994) (unpublished) (citation omitted).

[61] 29 U.S.C. § 1001.

[62] *Santana-Diaz*, 816 F.3d at 181.

final benefit determinations supports Congress' intent to facilitate claimant's easy access to important information, and it avoids the "counterintuitive" approach that the court in *Michael C.D.* noted. When taking into account Congress' policy considerations, this interpretation does not do violence to the text of the regulation.

Given the plain language of Sections (g) and (j), the court concludes a final benefit determination must notify the claimant of the time limit for filing a civil action.

### D. Remedy for noncompliance

ValueOptions does not dispute that it failed to provide notification of the Plan's 180-day time limit. As the court recognized in *William G.*, "there are two potential consequences" for a plan's failure to notify claimants of the time limit for a civil action in final adverse benefit determinations—equitable tolling or "presuming prejudice and rendering the Plan's limitations period unenforceable."[63]

ValueOptions does not argue the court should apply equitable tolling here, and, in any case, the court concludes equitable tolling would be inappropriate. Section (g) requires notification of the time limit in benefit determinations and does not appear to contemplate an alternative method of notification. To allow plan administrators to avoid this requirement through equitable tolling "would render hollow the important disclosure function of § 2560.503–1(g)(1)(iv), as plan administrators would then have no reason at all to comply with their obligation to include contractual time limits for judicial review in benefit denial letters."[64]

---

[63] *William G.*, 2017 WL 2414607, at *9.

[64] *Santana-Diaz*, 816 F.3d at 184.

The better rule is that a plan administrator who fails to notify claimants of the time limit cannot rely on that time limit to bar a late-filed civil action.[65]  The court therefore will not apply the Plan's 180-day time limit to Plaintiff's civil action.

Where no contractual time limit applies to an ERISA case, the court applies "the most closely analogous statute of limitations under state law."[66]  In Utah, the most analogous statute of limitations for an ERISA plan is the six-year time limit for a breach of contract action.[67]  In this case, ValueOptions notified Plaintiff of its final denial of her claim on May 1, 2014.[68]  Plaintiff filed her civil action on June 5, 2015, well within the six-year statute of limitations.[69]  As a result, Plaintiff's action was timely filed and the court must address Plaintiff's arguments on the merits of the denial of benefits.

## II.     Denial of benefits

Plaintiff urges the court to hold that ValueOptions should have covered M.K.'s RTC services at Aspen, while ValueOptions argues the court should uphold the denial.  To resolve this question, the court must first determine which standard of review applies.

### A.  Standard of review

The court reviews a denial of benefits under a de novo standard "unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan."[70]  If the administrator or fiduciary has reserved its

---

[65] *Accord id.* at 180; *Mirza*, 800 F.3d at 136; *Moyer*, 762 F.3d at 505; *John H. v. United Healthcare*, 2017 U.S. Dist. LEXIS 73593 at *7–8.

[66] *Salisbury*, 583 F.3d at 1247 (citation omitted).

[67] *Michael C.D.*, 2016 WL 2888984, at *2 (citing Utah Code § 78B-2-309(2)).

[68] R. 1030.

[69] Dkt. 2.

[70] *Hancock v. Metro. Life Ins. Co.*, 590 F.3d 1141, 1146 (10th Cir. 2009) (citation omitted).

discretionary authority, "then, absent procedural irregularities, the denial of benefits is reviewed under an arbitrary and capricious standard."[71]

The Tenth Circuit has been "comparatively liberal in construing language to trigger the more deferential standard of review under ERISA."[72]  Courts do not require "any magic words, such as 'discretion,' 'deference,' 'construe' or 'interpret' in order to find discretionary authority."[73]

For example, the Tenth Circuit has concluded that discretionary authority was granted where the plan grants authority "to interpret the terms of the Plan and to determine eligibility for and entitlement to Plan benefits in accordance with the terms of the Plan,"[74] and where a plan stated the plan administrator "makes all final decisions about benefits paid from the Plan."[75] Additionally, courts have found language providing that the plan administrator "determines" benefits is sufficient to convey discretion.[76]

Plaintiff argues a de novo review applies for two reasons: (1) the record contains only the SPD, not the Plan, and (2) even if the SPD is sufficient, it does not grant discretionary authority for determining benefits.

Plaintiff first argues that because the administrative record contains only the SPD and not the Plan itself, the court cannot determine whether the Plan grants discretionary authority to ValueOptions.

---

[71] *Kellogg v. Metro. Life Ins. Co.,* 549 F.3d 818, 825 (10th Cir. 2008).

[72] *Nance v. Sun Life Assur. Co. of Canada*, 294 F.3d 1263, 1268 (10th Cir. 2002).

[73] *Eugene S.,* 2010 WL 5300897, at *2 (citations omitted).

[74] *Hancock*, 590 F.3d at 1146.

[75] *Geddes v. United Staffing Alliance Emp. Med. Plan*, 469 F.3d 919, 924 (10th Cir. 2006).

[76] *Henderson v. Hartford Life & Acc. Ins. Co.*, No. 2:11-CV-187-DAK, 2012 WL 2419961, at *4 (D. Utah June 26, 2012) (citing *Winchester v. Prudential Life Inc. Co.*, 975 F.2d 1479, 1483 (10th Cir. 1992)).

The Tenth Circuit rejected a similar argument in *Eugene S. v. Horizon Blue Cross Blue Shield*.[77]  In that case, the Court noted the SPD contained the relevant language of the Plan, making it sufficient for the court to review.[78]  The Court also noted that the plaintiff did not request a copy of the plan or ask the district court to delay ruling on the parties' summary judgment motions so he could obtain a copy.[79]

Plaintiff in this case has not requested that a copy of the Plan be placed in the administrative record or that the court delay its ruling.  Additionally, the SPD states that it is part of the Plan and one of several "governing documents."  Finally, Plaintiff has not argued what parts of the Plan are relevant to her arguments but not included in the SPD.  Thus, the court concludes the language in the SPD is sufficient when analyzing whether the Plan grants discretionary authority.

Plaintiff also argues the Plan delegates discretionary authority to ValueOptions only for administrative duties and not for determining whether services should be covered.  Plaintiff is correct that the Plan uses explicit delegation language only for "administrative duties and responsibilities."[80]  However, the Plan states that service representatives may "make benefit determinations."[81]

There is no meaningful difference between the authority to "determine" benefits and the authority to "make benefit determinations."  Both terms inherently require some exercise of discretion.  The authority to make benefit determinations requires an analysis of the factors for

---

[77] 663 F.3d 1124 (10th Cir. 2011).

[78] *Id.* at 1132.

[79] *Id.*

[80] R. 1207.

[81] R. 1215.

coverage under the Plan, in contrast to cases in which a claim is "deemed denied" by operation of law.[82]  Thus, the court concludes the Plan grants discretionary authority to ValueOptions, and an arbitrary and capricious standard applies.

## B. Application of arbitrary and capricious standard

Under an arbitrary and capricious standard, the court's review "is limited to determining whether the interpretation of the plan was reasonable and made in good faith."[83]  The decision to deny benefits "need not be the only logical one nor even the best one. It need only be sufficiently supported by facts within [the plan administrator's] knowledge to counter a claim that it was arbitrary or capricious."[84]  The court should uphold the plan administrator's decision if it "fall[s] somewhere on a continuum of reasonableness—even if on the low end."[85]

Plaintiff argues ValueOptions's decision to deny the request for services was arbitrary and capricious because (1) the claims were not reviewed by physicians with the appropriate medical expertise, and (2) it did not provide a full and fair review by taking into account information submitted by Plaintiff.

### 1. Medical specialty of reviewing physicians

Plaintiff argues the ValueOptions and Allmed reviewers did not have a medical specialty or expertise comparable to M.K.'s treating physicians, and therefore their opinions did not provide a reasonable basis for the denials.

Under 29 C.F.R. § 2560.503-1(h)(3)(iii), a plan administrator must consult with "a health care professional who has appropriate training and experience in the field of medicine involved

---

[82] *See Gilbertson v. Allied Signal, Inc.*, 328 F.3d 625, 631 (10th Cir. 2003).

[83] *LaAsmar*, 605 F.3d at 796 (citation omitted).

[84] *Kimber v. Thiokol Corp.*, 196 F.3d 1092, 1098 (10th Cir. 1999) (citation omitted).

[85] *Id.* (alteration in original) (citation omitted).

in the medical judgment." Plaintiff argues ValueOptions' first reviewer, identified only as a doctor, and its second reviewer, identified as a psychiatrist specializing in behavioral medicine, did not have the training and experience in the relevant field of medicine for M.K.'s treatment. Plaintiff also argues the preparer of the Allmed report, who was listed as a psychiatrist with specialties in geriatric psychiatry and addiction medicine, was not qualified to provide an opinion on adolescent treatment. Plaintiff contends ValueOptions' failure to satisfy Section (h)(3)(iii)'s requirements is "so serious that [ValueOptions] forfeits the deferential standard of review to which a fiduciary may otherwise be entitled."[86]

Even assuming the identification and expertise of the reviewers did not satisfy Section (h)(3)(iii)'s requirements, the court concludes ValueOptions has substantially complied with ERISA and thus does not forfeit the deferential standard of review. ValueOptions has provided evidence that all three reviewers were psychiatrists, and Plaintiff has pointed to no authority that would require a more specific area of expertise in order to review an adolescent's claim. Thus, ValueOptions has substantially complied with Section (h)(3)(iii), and the arbitrary and capricious standard of review applies.

### 2. *Full and fair review*

Plaintiff argues ValueOptions did not take into account evidence she provided about M.K.'s condition and therefore did not provide a full and fair review.

ERISA plans are required to "afford a reasonable opportunity . . . for a full and fair review by the appropriate named fiduciary of the decision denying the claim."[87] A full and fair review means "knowing what evidence the decision-maker relied upon, having an opportunity to

---

[86] Dkt. 30 at 35.

[87] *Sandoval*, 967 F.2d at 381 (alteration in original) (citing 29 U.S.C. § 1133(2)).

address the accuracy and reliability of the evidence, and having the decision-maker consider the evidence presented by both parties prior to reaching and rendering his decision."[88]  The review must take into account "all comments, documents, records, and other information submitted by the claimant relating to the claim, without regard to whether such information was submitted or considered in the initial benefit determination."[89]  However, a full and fair review does not require "the taking of particular steps in response to a claimant's challenge or . . . a detailed explanation thereof in an appeal denial letter."[90]  In other words, a plan administrator need not explain "the reasoning behind the reasons."[91]

The Plan in this case provides six criteria for admission to RTC services, including whether the patient is "not sufficiently stable," can "respond favorably" to counseling and training, has "a history of poor treatment adherence or outcome," or has options for lower levels of care that are "appropriate to meet the individual's needs."[92]  The Plan lists eleven criteria for "continued stay" at an RTC, including whether the treatment is "appropriate to the individual's changing condition," care is rendered in "a clinically appropriate manner," and the family is "actively involved in the treatment."[93]  Plaintiff argues ValueOptions ignored M.K.'s behaviors while at Aspen that met all of these criteria, including having auditory and visual hallucinations, attempting to choke herself with the thread of an unraveled glove, scratching herself on the arm,

[88] *Sage v. Automation, Inc. Pension Plan & Tr.,* 845 F.2d 885, 893–94 (10th Cir. 1988) (citation omitted).

[89] *Adamson v. Unum Life Ins. Co. of Am.*, No. 2:98-CV-0286-TS, 2001 WL 35816762, at *6 (D. Utah May 30, 2001) (citing 29 C.F.R. § 2560.503–1(h)(2)(iv)).

[90] *Niedens v. Cont'l Cas. Co.*, 258 F. App'x 216, 220 (10th Cir. 2007).

[91] *Flinders v. Workforce Stabilization Plan of Phillips Petroleum Co.*, 491 F.3d 1180, 1192 (10th Cir. 2007). (abrogated on other grounds by *Spradley v. Owens-Illinois Hourly Emps. Welfare Ben. Plan*, 686 F.3d 1135 (10th Cir. 2012)) (citation omitted).

[92] R. 87.

[93] R. 88–89.

stuffing paper in her ears in an attempt to "keep the voices out," and attempting to choke herself with weather stripping from a window.

The record shows ValueOptions took these reports into account but did not conclude they required RTC services. The initial reviewing physicians focused on M.K.'s behavior after her discharge from the hospital, which would have provided the basis for RTC admission. One physician noted that between her discharge and her admission to Aspen, M.K. had only one instance of self-injurious behavior.[94] The physician's report stated that, even given this event, which involved M.K. using a knife to scratch her arms, she could have remained at home. Additionally, the Allmed physician reviewed all of M.K.'s records from Aspen and determined the criteria for RTC services were not met because the instances of M.K.'s self-injurious behavior were "superficial at best and did not require 24-hour intense supervision to control."[95]

The criteria for admission to RTC services and continued stay are highly subjective. ValueOptions' determination that M.K. did not meet these criteria relied on the physicians' well-detailed reports about M.K.'s history of treatment and other available options. The contrary report from M.K.'s outpatient therapist—who provided therapy to M.K. only until 2012— evinces a difference of opinion concerning the criteria, but does not show the medical opinions ValueOptions relied upon were unreasonable. Thus, the court concludes ValueOptions provided a full and fair review of Plaintiff's claim.

---

[94] R. 989.

[95] R. 1037.

While Plaintiff certainly had grounds for believing M.K. satisfied the criteria, the court cannot say that ValueOptions' denials were not based on any reasonable basis.[96] Thus, the court must affirm ValueOptions' denial of coverage. The Clerk of Court is directed to close the case.

## CONCLUSION

The court concludes that Plaintiff's action was timely filed. However, ValueOptions' denial of benefits was reasonable. Thus, Plaintiff's Motion for Summary Judgment is DENIED,[97] and ValueOptions' Motion for Summary Judgment is GRANTED.[98]

**SO ORDERED** this 25th day of September, 2018. The Clerk of Court is directed to close the case.

BY THE COURT:

ROBERT J. SHELBY
United States District Judge

---

[96] The fact that ValueOptions used nearly the same language in its two denials does not alter this conclusion. The physicians' decisions were detailed in their treatment reports, and the letter informed Plaintiff she could request copies of those reports.

[97] Dkt. 30.

[98] Dkt. 29.